2012 Ark. 164

**Chase A. PRATER, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 11–437.**

Supreme Court of Arkansas.

April 19, 2012.

Jeff Rosenzweig, Little Rock, for appellant.

Dustin McDaniel, Attorney General, Rebecca Kane, Assistant Attorney General, for appellee.

ROBERT L. BROWN, Justice.

Appellant Chase Prater was convicted of rape, kidnapping, sexual assault in the second degree, and felony impersonation after a jury trial in the Pulaski County Circuit Court. Prater was sentenced to serve a total of twenty-eight years on all four counts on July 25, 2008. His conviction and sentence were affirmed by the court of appeals on May 27, 2009. *Prater v. State*, 2009 Ark. App. 443, 2009 WL 1478252. Prater then filed a petition for postconviction relief under Arkansas Rule of Criminal Procedure 37.1, which the cir-

cuit court denied on January 24, 2011. Prater appeals from this order denying his petition. We affirm.

On appeal, Prater alleges three specific instances of ineffective assistance by his trial counsel: (1) trial counsel failed to make a specific directed-verdict motion on the kidnapping charge, which resulted in that issue not being properly preserved for appeal; (2) trial counsel failed to impeach a victim's testimony with photographs from two social-media websites, MySpace and LRGirls.com, depicting her at a party a few days after the rape and a comment by another victim that the two women were "hard core bitches"; (3) trial counsel failed to object to a violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), or, alternatively, trial counsel failed to prepare Prater properly for his testimony.

The facts underlying Prater's conviction are these. On August 3 and 4, 2007, Prater met two women, A.K. and A.R. at Mid–Town Billiards, a bar in Little Rock. Both A.K. and A.R. testified that they did not know Prater before that night. Likewise, both women testified that Prater introduced himself to them as "Randy" and stated that he was an undercover police officer who had been called in to assist with a drug raid at the bar. He told the women that the bar was about to be raided but that he would take them home. A.K. testified he told her that if they did not leave with him, he would arrest them and send them to jail. A.K. did testify that Prater allowed them to try to drive home in A.K.'s car. When A.R. tried to drive away, he banged on the window and said A.R. was "too messed up to drive." He then told the women that he would have to search them before driving them home. A.K. testified that when he searched her, Prater put his hands up her skirt and touched her vagina. Next, he pulled her shirt down and groped her breasts. After that, he told them to get in his car, and he drove them to A.K.'s home. When they arrived, A.K. testified that he would not let [A.R.] out of the car." A.K. testified that she went inside and did not tell her husband about the incident that night.

A.R. testified that, in addition to telling them he was an undercover police officer, Prater "flashed a badge." She stated that Prater would sporadically talk into either a cell phone or "walkie-talkie" device and say things like "two white females," followed by what sounded like some type of code. She added that after leaving A.K.'s house, Prater told her that he needed to take her to the police department because "either I'd been drugged or was on drugs." She further said that Prater told her the police would hold her for seven days if she tested positive for drugs and that "if he took me in he knew I would test positive." A.R. testified that she began calling friends to try to find a place to stay but that no one answered the phone. She then tried to rent a hotel room at the Days Inn in Morgan, where Prater had driven her, but her debit card was rejected so she could not rent the room.

After leaving the Days Inn, A.R. told the jury that Prater agreed to take her to her parents' house. She next testified that Prater pulled over in a gravel parking lot and told her he was going to have to search her. She said that Prater ordered her to take off her pants, and she complied, but when he ordered her to take off her underwear, she refused. At that point, A.R. testified that Prater took her underwear off and told her to turn around. He then climbed on top of her and vaginally raped her. A.R. then stated that as he began driving away from the parking lot, he forced her to perform oral sex on him. Next, she testified that he told her to get out of the car at a water tower near her

parents' home in Conway. She added that Prater began masturbating and ejaculated on her. She testified that after that happened he dropped her off at her parents' house, where she sat in the backseat of her father's truck until the next morning. A.R. reported the incident that afternoon.

In addition to the testimony of A.K. and A.R., Kelli Dixon, a forensic DNA examiner at the Arkansas State Crime Lab, testified for the State that a DNA profile obtained from semen recovered from A.R.'s shirt and capri pants was consistent with a DNA profile obtained from Prater. Ms. Dixon concluded that the DNA obtained from the shirt and capri pants originated, "within all scientific certainty," from Prater.

Prater also testified at his trial. According to his testimony, A.R. and he had met before the night the rape occurred. He testified that he helped A.K. and A.R. walk to A.K.'s car but that when A.R. tried to drive, "the car began to just—It was wildly jerking." He said that A.K. became "completely hysterical," and so he offered to take the two women to A.K.'s house. He testified that A.R. did not want to stay at the house and asked to stay with him, which he declined. He said that as he was driving, they began kissing and it "became a little more passionate," so they pulled into a gravel parking lot near her parents' house. Prater testified that they did have sex but it was consensual.

During cross-examination of Prater by the State, the following exchange occurred:

PROSECUTOR: You can explain yourself well enough to convince the girls out on the street. You feel you can explain yourself well enough to convince people in this Court Room, don't you?

DEFENDANT: My story's been the same from the beginning.

PROSECUTOR: Who did you tell your story to?

DEFENDANT: My attorney.

PROSECUTOR: You didn't tell it to anyone else.

DEFENDANT: No, sir.

PROSECUTOR: Nobody else.

DEFENDANT: No, sir.

PROSECUTOR: I mean, this is my first time hearing it, right?

DEFENDANT: Yes, sir.

PROSECUTOR: Okay. But your story's been the same from the beginning?

DEFENDANT: Yes, sir.

PROSECUTOR: And the only person we have to go on is you.

DEFENDANT: I figured my attorney or my family or—

PROSECUTOR: I mean, you've had chances to explain this along the way, right?

DEFENDANT: Only when they first brought me in.

PROSECUTOR: How come we're just now hearing it then?

DEFENDANT: There was no way, there was no way. Everything that you're taught in the military, everything you're taught about—Even just watching regular TV, if something like this happens, guilty or innocent, you do not have to say anything to anyone until you have somebody there to help defend you. Because if you're already in there, everybody's already against you.

You get somebody in there who's able to make sure that—If you are innocent, that they're there to take care of you. So you don't say anything until you have that person there.

PROSECUTOR: Okay. So you didn't want to tell your story until you've had a chance to talk with your attorney about what your story is going to be.

DEFENDANT: No.

PROSECUTOR: Is that what you're telling us?

DEFENDANT: My story. I told my story directly to my attorney first thing, and from that he's worked from there. My story has never changed.

PROSECUTOR: But you didn't want anyone else to hear it until you had a chance to speak with your attorney?

DEFENDANT: Yes, sir.

Prater's counsel did not object during this exchange.

At the close of the State's case, Prater's counsel moved for a directed verdict on the kidnapping count as follows: "State hasn't shown that Chase Prater did restrain, without consent, [A.R.] as to interfere substantially with her liberty for the purpose of inflicting physical injury upon her or engaging in sexual intercourse, deviate sexual activity and sexual contact with her." Although the circuit court denied the motion for directed verdict, it granted Prater's motion to reduce the kidnapping from a Class Y felony to a Class B felony because A.R. was released in a safe place. Prater's counsel renewed the motion for directed verdict at the close of all the evidence.

In his direct appeal, Prater contended that there was insufficient evidence to show that he restrained A.R. against her will with an amount of force that was greater than that incidental to the commission of the rape. *Prater*, 2009 Ark. App. 443, at 1, 2009 WL 1478252. The court of appeals held that the argument was not preserved for review because Prater did not make the same argument to the trial court. *Id.* at 2.

During the hearing on Prater's Rule 37 petition, Prater's trial counsel testified that there was no basis for a directed verdict on the basis of restraint for the kidnapping charge. He acknowledged that the State had met its burden on that issue. Trial counsel also testified that he was not familiar with *Summerlin v. State*, 296 Ark. 347, 756 S.W.2d 908 (1988), at the time of trial and acknowledged that A.R. did get out of the car on several occasions before the rape occurred. Trial counsel further testified that he had seen the photographs from MySpace or LRGirls.com prior to trial. He testified that he discussed the photographs with other attorneys in his office and decided that they were not relevant. Specifically, he testified, "I felt that that could become relevant if she testified at trial that she was so distraught that she couldn't leave her house.... I thought it could backfire.... I chose not to risk upsetting the jury for the introduction of this photograph."

Regarding the alleged *Doyle* violation, trial counsel testified that he did not do a mock direct or cross-examination exercise with Prater prior to trial. Trial counsel asserted that once Prater testified that "his story has stayed the same," the door was opened to inquiry into whom Prater might have told his story to previously. In addition, trial counsel testified that he "chose not to object because I didn't want the jury to feel that I was trying to hide something.... I didn't want it to come across that I was trying to hide something.... I thought Mr. Prater's testimony was actually going well." Trial counsel also maintained that Prater was properly prepared for trial and that he met with Prater at Prater's residence three times and at counsel's office twice.

The trial court denied Prater's Rule 37 petition in full. The trial court found that had counsel moved for a directed verdict on kidnapping based on the argument that the restraint used was merely incidental to the commission of the rape, the motion would have been denied. The trial court noted that Arkansas Model Jury Instruc-

tion 1101, which was read in Prater's case, provides that "a person is restrained without consent if he is restrained by physical force or threat or by deception." The trial court found that A.R. was restrained without her consent by the threat of arrest and detention for seven hours by a person she believed to be a police officer who had displayed what she thought was an authentic police officer's badge. Thus, the trial court concluded that, even had the issue been preserved, there would have been no meritorious argument on direct appeal.

On the second issue, the photographs of A.R. and the "hard core bitches" comment posted by A.K., the trial court determined that the fact that a "rape victim was apparently enjoying herself several days after the rape occurred, does not have much, if any relevance as to whether or not the rape occurred." Likewise, the trial court decided that a comment posted by A.K. that she and A.R. were "hard core bitches," had no relevance. The trial court determined that trial counsel's decision was a matter of trial strategy and did not constitute ineffective assistance of counsel.

The trial court also rejected Prater's *Doyle* argument. The trial court first determined that Prater opened the door to questions concerning whom he told his story to when he responded that "my story has been the exact same from the beginning." The trial court further decided that there was no testimony as to when Prater was advised of his *Miranda* rights, or any inquiry into why he did not tell the arresting officer his story. The trial court added that trial counsel's decision not to object to questions was not of such a magnitude as to render counsel's performance constitutionally deficient.

On appeal from a trial court's ruling on a petitioner's request for Rule 37 relief, this court will not reverse the trial court's decision granting or denying post-conviction relief unless it is clearly erroneous. *Kemp v. State*, 347 Ark. 52, 55, 60 S.W.3d 404, 406 (2001). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.*

The criteria for assessing the effectiveness of counsel were enunciated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which provides that when a convicted defendant complains of ineffective assistance of counsel he or she must show that counsel's representation fell below an objective standard of reasonableness and that but for counsel's errors the result of the trial would have been different. We adopted the rationale of *Strickland* and held:

> [t]o prevail on any claim of ineffective assistance of counsel, the petitioner must show first that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment. Secondly, the petitioner must show that the deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the petitioner of a fair trial.

*Kemp*, 347 Ark. at 56, 60 S.W.3d at 407 (citing *Thomas v. State*, 330 Ark. 442, 954 S.W.2d 255 (1997)).

Prater's first point for reversal is that the trial court erred in finding that his trial counsel was not ineffective for failing to move for a directed verdict on the specific issue of the amount of restraint used to commit the kidnapping. Because counsel did not move for a directed verdict on that basis, the issue was not preserved for

direct appeal. Thus, the appellate court could not address the issue on the merits.

■ A person commits kidnapping if, without consent, the person restrains another person so as to interfere substantially with the other person's liberty with the purpose of engaging in sexual intercourse, deviate sexual activity, or sexual contact with the other person. Ark.Code Ann. § 5–11–102(a)(5) (Repl.2006). Restraint without consent includes restraint by physical force, threat, or deception. Ark.Code Ann. § 5–11–101(3)(A) (Repl.2006). Only when the restraint exceeds that normally incidental to the crime of rape will the rapist be subject to prosecution for kidnapping. *Summerlin,* 296 Ark. at 350, 756 S.W.2d at 910.

■ When alleging ineffective assistance of counsel for failure to preserve an issue for direct appeal, the petitioner must show that there was a meritorious basis upon which counsel could have filed a motion or made an objection. *Eastin v. State,* 2010 Ark. 275, at 2, 2010 WL 2210924. In the instant case, Prater maintains that the State failed to show he used more restraint than what was required to commit the rape because A.R. voluntarily got into his car and left his car on at least one occasion in an attempt to get a hotel room. Restraint, however, is not limited to physical force but includes threats or deception. As the trial court found, the State presented ample evidence that Prater threatened A.R. with arrest and a seven-day detention. There was also evidence that Prater told her he was a police officer and showed her a badge, which constituted deception. Thus, the State presented substantial evidence that Prater used threats or deception to restrain A.R. Under these circumstances, Prater fails to show that counsel had a meritorious basis for making a motion for directed verdict on the restraint issue. We affirm the trial

court's denial of postconviction relief for ineffective assistance of counsel because trial counsel's performance was not deficient in this matter.

Prater's next point is that his trial counsel was ineffective for failing to use photographs showing A.R. at a party in the days after the rape occurred. Prater contends that his counsel misunderstood the rape-shield statute and so he declined to try to introduce the photographs. Prater's trial counsel, however, testified that the photographs were not relevant, and he felt that there was a risk of inflaming the jury if he tried to introduce them. The trial court agreed that the photographs were not relevant and that counsel was not ineffective for failing to introduce them.

■ "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R. Evid. 401. This court indulges in a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Burton v. State,* 367 Ark. 109, 111, 238 S.W.3d 111, 113 (2006). The defendant claiming ineffective assistance of counsel has the burden of overcoming that presumption by identifying the acts and omissions of counsel which, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *Id.* The petitioner must show that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt and that the decision reached would have been different absent the errors. *Id.*

■ As the trial court found, photographs of the victim taken several days after the rape are of questionable relevance, and the statement that the two

women were "hard core bitches" had no relevance to the issues in the trial. A.R. did not testify that she was unable to leave her home or enjoy social activities after the rape. The fact that she did not, in Prater's view, look like a victim some days after the event is irrelevant to the question of whether he raped her. Furthermore, trial counsel testified that he did not want the photographs to backfire or inflame the jury. Thus, his decision was not related to a misunderstanding of the rape-shield statute but was a matter of trial strategy. We find no error in this regard. Prater has failed to show that counsel made an unreasonable professional judgment, and we affirm the trial court on this point.

Prater's final contention is that the trial court erred in finding that his counsel was not ineffective for failing to object to a blatant *Doyle* violation of his right to remain silent, or, in the alternative, for not properly preparing him for his testimony. Although there is nothing in the trial record to indicate when or if Prater was read his *Miranda* rights, during the hearing on his Rule 37 petition, Prater testified that when he was arrested he was advised of his rights, including his right to remain silent.

In *Doyle v. Ohio*, the Supreme Court of the United States held that use for impeachment purposes of a defendant's right to silence at the time of arrest after receiving *Miranda* warnings violates the Due Process Clause of the Fourteenth Amendment. 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91. *Miranda* warnings are a prerequisite of a *Doyle* violation; in the absence of the sort of affirmative assurances embodied by the *Miranda* warnings, the United States Constitution does not prohibit the use of a defendant's postarrest silence to impeach him at trial. *Greer v. Miller*, 483 U.S. 756, 763, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987).

This court has recognized that it is fundamentally unfair and a deprivation of due process for an arrested person's silence, following *Miranda* warnings, to be used to impeach an explanation subsequently offered by him at trial. *Burnett v. State*, 310 Ark. 202, 205, 832 S.W.2d 848, 849 (1992). A *Doyle* violation may be harmless error, however, where there is no prosecutorial focus or repetitive questioning or arguing centered on the defendant's silence and where the evidence of guilt is overwhelming. *Id.*

In *Burnett v. State*, this court rejected an ineffective-assistance-of-counsel claim based on the failure to object to a *Doyle* violation. 310 Ark. 202, 832 S.W.2d 848 (1992) (per curiam). John Burnett was convicted of first-degree murder in the death of his wife and sentenced to life imprisonment. *Id.* at 203, 832 S.W.2d at 848. Rejecting Burnett's claim of ineffective assistance, the trial court determined that the questions concerning Burnett's silence at the time of his arrest, which were asked without objection by the defense, were allowed as a matter of trial strategy, that the attorney was aware of the objectionable nature of the questions, that he had discussed those questions with Burnett, that he had thoroughly prepared Burnett for his testimony, and that he had determined that the best strategy was to make sure the jury knew Burnett was holding nothing back. *Id.* at 207, 832 S.W.2d at 850. This court affirmed, noting that the reason given by trial counsel for not objecting "may be one about which seasoned advocates could disagree," but that the finding that it was a strategic decision was not clearly against the preponderance of the evidence. *Id.*

On direct appeal in *Robinson v. State*, this court refused to reverse a conviction based on an alleged *Doyle* violation. 348 Ark. 280, 72 S.W.3d 827 (2002). We re-

viewed three separate exchanges in *Robinson*. We found no *Doyle* violation in the first exchange because it took place out of the hearing of the jury. Likewise, we found no violation when the testimony was brought forth by the defense without objection. Regarding the third exchange, this court concluded that there was no reversible error because the jury had already heard that the defendants had refused to give a statement during defense counsel's questioning of one of the detectives investigating the case, the defendants could not show prejudice because they opened the door to this line of questioning, and, finally, the prosecutor did not dwell on the issue and ceased all questioning concerning statements when the trial court sustained defense objections. *Id.* at 293–94, 72 S.W.3d at 835.

This court has also refused to find error under *Doyle* when the reference to the defendant's silence is inadvertent and the prosecutor did not dwell on the issue. *See Ferrell v. State*, 325 Ark. 455, 929 S.W.2d 697 (1996); *see also Tarkington v. State*, 313 Ark. 399, 855 S.W.2d 306 (1993) (holding that there was no *Doyle* violation when there was no comment or question by the prosecutor about a defendant's postarrest silence but instead there was an inadvertent reference to the defendant's silence by a witness).

We agree with Prater that a *Doyle* violation occurred in this case. The prosecutor repeatedly focused on Prater's admission that he had not told his story before he talked to counsel. Clearly, he did not have to tell anyone his story after he was Mirandized because of his right to remain silent.

Nonetheless, ineffective assistance of counsel requires more than a showing that a *Doyle* violation occurred. That claim requires a showing that his trial counsel's decision not to object fell below an objective standard of reasonableness and that but for counsel's errors the result of the trial would have been different. *See Burnett*, 310 Ark. 202, 832 S.W.2d 848; *see also Strickland*, 466 U.S. 668, 104 S.Ct. 2052. The trial court's order in the instant case does not contain similarly detailed findings that the *Burnett* court made regarding defense counsel's efforts to prepare his client for questions on his right to remain silent. The trial court did, however, find that defense counsel's failure to object was a strategic decision "because he believed the trial was going well, and he did not want the jury to think he was trying to hide something."

In addition, the trial court found that trial counsel met with Prater at least five times, three times at Prater's home and twice at counsel's office. The trial court acknowledged that trial counsel did not conduct any mock questioning with Prater in preparation for trial. In this regard, the trial court found that the lack of mock questioning in preparation for trial did not demonstrate ineffective assistance. Despite Prater's contention otherwise, *Burnett* does not require that trial counsel conduct a mock examination every time a defendant wishes to testify. Like counsel in *Burnett*, trial counsel in the instant case understood the objectionable nature of the questions and allowed the questions as a matter of trial strategy. Conducting a mock examination was only one of many factors that the trial court considered in *Burnett* and is not solely determinative of an ineffective-assistance claim. Thus, we reject Prater's contention that his counsel was ineffective for failing to conduct a mock examination prior to his testimony.

This court has repeatedly said that matters of trial strategy and tactics, even if arguably improvident, are not grounds for

a finding of ineffective assistance of counsel. *See, e.g., Burnett*, 310 Ark. 202, 832 S.W.2d 848. Defense counsel's strategy was to try to convince the jury that Prater was credible and that he was not hiding anything. While seasoned advocates may disagree on that strategy, the trial court's finding that it was a considered strategic decision on trial counsel's part was not clearly erroneous. We affirm the trial court's denial of Rule 37 relief on this point as well.

In sum, we find no defective performance on the part of trial counsel under *Strickland* as claimed by Prater. Accordingly, we affirm.

Affirmed.