Steven Ralph TEATER  *v.*  STATE of Arkansas

CA CR 04-384                                          201 S.W.3d 442

Court of Appeals of Arkansas
Opinion delivered January 26, 2005

*Gary D. McDonald* and *William A. McLean*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

SAM BIRD, Judge. Appellant Steven Teater was charged with murder in the first degree and attempted murder in the first degree in connection with the killing of his wife and the shooting of her friend Rod McKinney. Following a jury trial, Teater was convicted of murder in the second degree, a Class B felony, and attempted murder in the second degree, a Class C felony. He received sentences of twenty years and ten years, respectively, in the Arkansas Department of Correction; was fined $25,000; and was ordered to pay court costs in the amount of $150. Teater's sole point on appeal is that the trial court erred when it refused to instruct the jury on the issue of mental disease or defect. Although the State concedes that the court should have instructed the jury on mental disease or defect, it contends that the omission of the instruction constitutes harmless error because Teater was not prejudiced by it. We agree with Teater and reverse.

At trial, McKinney's neighbor Kenneth Smith testified that sometime after lunch on January 18, 2003, at approximately 1:00 or 2:00 p.m., he heard gunshots coming from McKinney's residence. Smith stated that he looked toward McKinney's house and saw two people standing on the front porch. He also said that he noticed a black Dodge truck in front of the house — the same truck that he had seen "a time or two before that same day."

Smith stated that he saw McKinney running out of the back of the house, and that he again heard gunshots. He said that he thought he heard a woman screaming, "What are you doing?" and that he saw a man go into McKinney's house. According to Smith, the man came back out of the house, looked down at a woman lying on the porch, and shot her three times. The man then went back through the house, came out, went down the steps, looked back at the woman's body, and drove off in his truck. Smith said that McKinney later returned to the house, pulled down his pants, and said, "I been hit too."

Rusty Bailey, a friend of Steven Teater and an employee of the Ouachita County Sheriff's Department, said that he received a call from Teater around 2:00 that afternoon. According to Bailey, Teater said that he had shot and killed his wife Becky because he found out that she was having an affair. Bailey testified that Teater also said that he had shot at McKinney and that his gun jammed. Bailey also believed that he heard Teater say, "If I would have had the nine I don't believe it would have jammed," or something to that effect. While Teater was on the phone with Bailey, Teater drove up to the Camden Police Department and their conversation ended. Bailey said that during the conversation, Teater did not seem emotionally upset, panicked, or confused, but "was quite clear about what had just happened."

Boyd Good, the Camden Police Chief, testified that he encountered Teater in the parking lot of the police station after the shooting. At that point, Teater was attempting to get out of his truck. Good ordered him to the ground, and Teater said, "I did it because she was cheating on me." According to Good, once Teater was on the ground, he "threw a cell phone and it landed on the pavement." During this encounter, Good said that Teater "didn't appear to be excited" and that "there was not any confusion evident in his behavior."

Becky Teater was later found dead on the front porch of McKinney's residence. According to George Ingram, the investigating officer, Steven Teater was initially "calm" and "emotionless" during an interview after the shootings, but he became "emotionally distressed" and began to cry uncontrollably as the interview progressed.

Dr. Bradley Diner, a Little Rock psychiatrist, testified as an expert witness on Teater's behalf. Dr. Diner testified that he evaluated Teater in August of 2003. He said that Teater did not

have "any active, current psychiatric disorder" and that Teater was able to appreciate the wrongfulness of the acts in question. However, Dr. Diner also stated as follows:

> Because of the way [Teater] handles emotional feelings and stress I think that he was overwhelmed and when he saw Becky and Mr. McKinney together I think that was too much for him and I think this erupted in the aggressive act. That inability to conform can be a very limited period of time.

He also testified that he believed Teater experienced a "dissociative episode" where he blocked out the shooting incident from his memory, although Teater was aware of what he was doing both before and after the shootings.

Teater testified in his own defense, stating that his wife Becky had engaged in numerous affairs over the course of their marriage and that he was "upset" and "started slapping her" when he suspected she was having an affair with Rod McKinney. He also said that he went over to McKinney's house approximately three times on the day of the shootings, twice with his wife and once by himself. On the third trip, he took Becky over to McKinney's house "to apologize." Teater testified that he did not recall what happened after that, except that he remembered being in jail and having his mother there. He specifically denied any knowledge of making phone calls after the shootings. He also said it was not his purpose to kill McKinney or to kill Becky when he went to McKinney's residence.

The State then produced rebuttal witness Dr. William C. Peel, a psychologist from El Dorado, Arkansas. Dr. Peel testified that, during his evaluation of Teater, Teater admitted to assaulting his wife prior to the shooting incident at McKinney's home. According to Dr. Peel, Teater also remembered hearing gunshots, being in his truck and driving away, and making phone calls after the shootings. Dr. Peel also stated that Teater remembered arriving at the police station and being arrested and questioned. Dr. Peel said that, based on his evaluation, Teater "had the capacity for purposeful and knowing conduct" at the time of the shootings. Dr. Peel specifically concluded that "Mr. Teater was capable of knowing right from wrong and of conforming his behavior to the rules of law, should he have chosen to do so."

After testimony ended, Teater requested that the court instruct the jury on the affirmative defense of mental disease or

defect. He also requested jury instructions on the lesser-included offenses of second-degree murder, attempted second-degree murder, manslaughter, and attempted manslaughter. The trial judge refused to give the instruction on mental disease or defect based on his finding that there was no evidence to support the instruction. The trial court did, however, instruct the jury on the lesser-included offenses of second-degree murder, attempted second-degree murder, manslaughter, and attempted manslaughter.

■■■ A party is generally entitled to an instruction on a defense if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction. *Davis v. State*, 293 Ark. 472, 739 S.W.2d 150 (1987). Mental disease or defect is an affirmative defense and the burden rests upon the appellant to prove that he lacked the capacity, as a result of mental disease or defect, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct. *Briggs v. State*, 18 Ark. App. 292, 715 S.W.2d 223 (1986); Ark. Code Ann. § 5-2-312 (Supp. 2003). To entitle the appellant to a jury instruction on mental disease or defect, there must be some indication from the evidence that he lacked the appreciation that sane men have of what it is they are doing and of its legal and moral consequences. *Davis v. State, supra.*

■ Where there is conflicting testimony on the question of a defendant's sanity at the time of the offense, the issue is a fact question for the jury to decide. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001). The jury alone determines what weight to give the evidence, and may reject or accept all or any part of the evidence that it believes to be true. *Id.*

■ In this case, there was testimony from two expert witnesses, Dr. Bradley Diner and Dr. William C. Peel. Dr. Diner opined that, although he could not diagnose Teater with a specific mental disease or defect, Teater had a defect in his personality structure and ability to handle stress that limited his ability to conform his conduct to the requirements of the law when he killed his wife and shot Rod McKinney. On the other hand, Dr. Peel said that Teater both appreciated the wrongfulness of his actions and could have conformed his conduct to the requirements of the law because he "had the capacity for purposeful and knowing conduct" at the time of the shootings. Because the issue of Teater's

sanity at the time of the shootings was a fact question for the jury, we hold that the trial court should have instructed the jury concerning the defense of mental disease or defect.

In support of its contention that the trial court's failure to give the mental disease or defect instruction was harmless error, the State asserts that, because the jury convicted Teater of second-degree murder and attempted second-degree murder, it essentially found that Teater acted "knowingly" in this case.[1] As a result, the State argues that it is implausible to believe that the jury could have accepted Teater's defense that he did not know what he had done. We do not agree.

Although some constitutional rights are so fundamental that their violation can never be deemed harmless error, others are subject to harmless-error analysis. *See Chapman v. California*, 386 U.S. 18 (1967). In *Chapman*, the United States Supreme Court held that, before a federal constitutional error can be held harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Id.* More specifically, the test is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Id.*

Certain constitutional errors, however, are so intrinsically harmful that they render a trial fundamentally unfair. *See, e.g., Sullivan v. Louisiana*, 508 U.S. 275 (1993). In *Sullivan*, the Supreme Court found that a constitutionally deficient jury instruction concerning the burden of proof was a "structural" error that was not amenable to harmless-error analysis and thus required auto

---

[1] In its brief, the State notes that the instructions on second-degree murder in this case were based on Ark. Code Ann. § 5-10-103(a)(1) (Repl. 1997), which provides that a person commits second-degree murder if he "knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life[.]" The State also points out that the court gave the jury the following definition of "knowingly" contained in Ark. Code Ann. § 5-2-202(2) (Repl. 1997):

> A person acts knowingly with respect to his conduct or the attendant circumstances *when he is aware* that his conduct is of that nature or that such circumstances exist. A person acts knowingly with respect to a result of his conduct *when he is aware* that it is practically certain that his conduct will cause such a result[.]

(Emphasis added.)

matic reversal of the defendant's conviction. *Id.* The Court stated as follows:

> In [*Arizona v. Fulminante,* 499 U.S. 279 (1991)], we distinguished between, on the one hand, "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards," ... and, on the other hand, trial errors which occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented[.]" ... Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former sort, the jury guarantee being a "basic protectio[n]" whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function.... The right to trial by jury reflects, we have said, "a profound judgment about the way in which law should be enforced and justice administered." ... The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error."

*Sullivan,* 508 U.S. at 281-82.

To support its harmless-error argument in this case, the State cites *Sasser v. State,* 338 Ark. 375, 993 S.W.2d 901 (1999), in which the Arkansas Supreme Court held that the omission of an element from a jury instruction was not a "structural" error that precluded harmless-error review. The court in *Sasser* cited *Neder v. United States,* 527 U.S. 1 (1999), where the United States Supreme Court recognized that the failure to properly instruct a jury on an element of an offense was subject to harmless-error analysis under *Chapman.* Here, citing *Neder,* the State contends that a jury instruction error can be harmless beyond a reasonable doubt if it does not vitiate all the jury's findings. From this, the State reasons that, because there is no possibility that the jury would have found that Teater's actions were excused due to his alleged mental disease or defect, the failure to instruct in this case was harmless error.

On the other hand, Teater argues that the error in omitting the instruction on mental disease or defect is a "structural" error that is not subject to harmless-error review. We agree. The Sixth Amendment to the United States Constitution affords a criminal defendant the right to have an impartial jury reach the requisite finding of guilt. *See Sullivan v. Louisiana, supra.* We cannot apply the harmless-error standard of review in this case because to

do so would force this court, inappropriately, to speculate about what the jury would have done had it been properly instructed. *See id.*

Reversed and remanded.

HART and ROAF, JJ., agree.