Cite as 2022 Ark. 23

# SUPREME COURT OF ARKANSAS
No. CR-21-202

|  |  |  |
|---|---|---|
| RANDY WILLIAM GAY | | **Opinion Delivered:** February 10, 2022 |
| | APPELLANT | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26CR-11-428] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE RALPH C. OHM, JUDGE |
| | APPELLEE | |
| | | <u>AFFIRMED</u>. |

**KAREN R. BAKER, Associate Justice**

Appellant Randy William Gay appeals the Garland County Circuit Court's denial of his postconviction petition to vacate his conviction and sentence of death filed pursuant to Rules 37.1–37.5 of the Arkansas Rules of Criminal Procedure. A Garland County jury convicted Gay of capital murder for the shooting death of Connie Snow and sentenced Gay to death. We affirmed his conviction and sentence in *Gay v. State*, 2016 Ark. 433, 506 S.W.3d 851 ("*Gay I*"). Gay subsequently filed a petition to vacate his conviction and sentence. The circuit court denied his petition and this appeal followed. On January 21, 2021, we reversed and remanded this matter for entry of an order containing findings of fact and conclusions of law in compliance with Rule 37.5(i). *Gay v. State*, 2021 Ark. 3, at 2 ("*Gay II*"). We held that the circuit court's order denying the postconviction petition did not include findings of fact or conclusions of law addressing Gay's claim that his trial counsel

was ineffective for failing to adequately investigate and challenge the aggravating factors of the second-degree murders of Glen Gay--Gay's father--and Jim Kelly. On April 23, 2021, the circuit court entered a supplemental order denying Rule 37 relief and Gay timely appealed.

On appeal, Gay presents the following six points: (1) he was denied the right to a fair and impartial jury; (2) he was denied effective assistance of trial counsel; (3) form 3 of the death-penalty jury instructions precluded the jury from exercising mercy in violation of the Fifth, Eighth, and Fourteenth Amendments and article 2, sections 8, 9, and 10 of the Arkansas Constitution; (4) his sentence of death did not meet the statutory and constitutional requirements for imposing a death sentence; (5) the verdict forms were ambiguous; and (6) the State improperly argued lack of remorse as a nonstatutory aggravating factor.

The pertinent facts are these. The record demonstrates that James Westlake testified that he and his family operated a timber business in Garland County in 2011. James testified that he paid Gay "a few hundred dollars each week" to "keep an eye" on their equipment overnight. On May 10, 2011, James, Jim Westlake, and Rickey Stewart were attempting to repair machinery at their logging business in a wooded area located in Garland County. Around 5:00 p.m. that day, Gay arrived in a pickup truck, and Snow was in the passenger seat. Gay got out of his truck and went to speak to James, leaving Snow in the vehicle. Gay told James that he was using Snow to obtain information about drug trafficking in the national forest and that she was probably going to jail. James noticed that Snow was

2

attempting to say something to Gay from the vehicle, and when he told Gay, Gay then ordered Snow out of the truck. Snow did not comply and Gay went back to his truck, retrieved a shotgun, and again ordered Snow out of the truck. James testified that Snow was getting out of the truck, that he did not believe Gay was going to take any action, and that James turned away from the truck and back to the machinery when he heard a loud "BOOM." James testified that he turned around and saw Snow's body on the ground and that Gay was holding the gun toward the ground. James testified that he immediately told Gay, "I didn't see anything." James testified that Gay calmly walked over and asked him if he had any plastic, and he responded that he did not. He then asked James to help him get his tailgate open. James said he was somewhat in shock and did not know whether Gay was going to kill the rest of them or what his next move was. James went over and helped with the tailgate and then checked on his elderly father. James testified that while he went to check on his dad, he kept his eyes on Gay because he did not know what was going to happen and watched Gay drag Snow over and load her into his truck bed. Gay then loaded Snow's body into his truck, left the site, and gave James a "thumbs up" on the way out. James testified that Gay then called him on his cell phone and asked if everything was "alright between them." James explained that they were loading logs and did not mention Snow because he was afraid, he did not know where Gay was, and that he and his employees were unarmed. James testified that he and his employees left together and that once they were back out of the woods safely to the highway, he, his brother, and Rickey called law enforcement and waited for them to arrive.

Rickey testified that when Gay summoned Snow from the truck, she failed to move. Gay then grabbed a bolt-action shotgun from the toolbox in the back of his truck, stuck it through the open driver's-side window, and again ordered her out of the vehicle. Snow still did not move. Gay walked to the back of his truck, propped his elbow on the vehicle, again pointed the gun at Snow, and yelled, "I told you to get the fuck outa my truck." Snow stepped out of the truck, keeping her back to the inside of the open door, and said, "What are you gonna do, shoot me?" Rickey heard Gay click off the gun's safety, and Gay then shot Snow in the right side of her face, killing her. Gay asked James if he had any plastic, and when James stated that he did not, Gay asked him to help him lower the tailgate of his truck. Gay dragged Snow by the belt loops of her jeans and her hair to the back of his truck and threw her body into the truck bed. He then drove away from the work site, giving James a "thumbs up" on the way out. James indicated that Gay phoned him several minutes later to see if everything was okay and to tell him that he "got everything taken care of." James and the others then notified law enforcement of the murder.

That evening, Gay attended a bonfire at the home of Larry and Vera Nevels and stayed the night with his girlfriend, Latonya McElroy. The next morning, he told McElroy that he had to "get rid of" something. He was arrested as he got into his car to leave the apartment. Gay claimed that he had a severe drinking problem and that he did not remember what happened the previous day. Snow's body was located four days later, on May 14, 2011, approximately 1.2 miles from the shooting in a shallow creek bed. On the other side of the creek, officers located Snow's hair and her scalp. It was evident that animals had predated

on the body. Gay was charged with premeditated capital murder, and the State sought the death penalty.

On April 15, 2013, Gay's first trial ended in a mistrial after the circuit court found that several members of the jury had violated instructions by conducting independent online research about the murder. Gay was retried on March 11–15, 2015. Following the guilt phase of the trial, the jury convicted Gay of capital murder. During the penalty phase, the prosecution introduced evidence of three prior felony offenses, all of which were used as aggravating circumstances: (1) the second-degree murder of his then father-in-law, Jim Kelly, in 1978; (2) the second-degree murder of his father, Glen, in 1991; and (3) the terroristic threatening of John Ward in 2007. The defense submitted approximately seventy mitigating circumstances, most of which related to Gay's tumultuous and abusive relationship with his father, his heavy alcohol use, and his good behavior while incarcerated for his prior crimes. The jury found that the aggravators outweighed the mitigators and sentenced him to death.

On May 28, 2017, Gay filed a petition to vacate his conviction and sentence pursuant to Arkansas Rule of Criminal Procedure 37.1. On December 6, 2018, the circuit court conducted a two-day hearing on the petition. Gay presented several expert witnesses, including Dr. Matthew Mendel, Dr. John Roache, and law professor J. Thomas Sullivan. Dr. Mendel, an expert on the impact of childhood trauma, testified that he had interviewed Gay on October 24–25, 2018. He identified fourteen risk factors for a negative outcome that resulted from adverse events during Gay's childhood such as sexual abuse by Gay's father, by other juveniles in a "children's home" and in prison; abandonment by both his parents;

alcohol abuse; physical and verbal abuse by his father; and witnessing violent acts of his father on others, including a murder of his cousin and attempted sexual assaults of Gay's wives. Dr. Mendel diagnosed Gay with PTSD, alcohol dependency, and depression. He opined that Gay's childhood traumas and diagnoses caused him to react suddenly, violently, and aggressively when confronted with a threatening situation and that this would have been helpful information for the jury to know during sentencing. Dr. Roache testified as an expert in psychiatry and pharmacology. From a review of Gay's records, he diagnosed him with severe alcohol-use disorder, depression, anxiety, and PTSD. According to Dr. Roache, the combination of alcoholism and PTSD caused Gay to react impulsively and aggressively. Professor Sullivan testified to the capital-defense standards and also that Gay's attorneys performed deficiently, particularly with respect to jury selection and the investigation and presentation of mitigating evidence. Finally, Gay's trial counsel, Mark Fraiser, and his mitigation specialist, Ashley Hornibrook, both testified. They explained that many of the decisions challenged by Gay in his petition were a result of trial strategy, and they further explained that Gay would not testify during the sentencing phase or cooperate with their mitigation investigation.

Following the submission of posttrial briefs, on March 5, 2019, the circuit court entered an order denying all of Gay's claims for relief and finding that he had received effective assistance of counsel. Gay timely appealed, and we reversed and remanded for additional findings of fact and conclusions of law. *Gay II*, 2021 Ark. 3. Following our remand, the circuit court entered a supplemental order adopting the previous order and

6

adding detailed findings and conclusions of law as directed by this court. The court again concluded that Gay's Rule 37 petition should be denied, and Gay timely appealed from this supplemental order.

## I. *Fair and Impartial Jury*

For his first point on appeal, Gay argues that he was denied the right to a fair and impartial jury under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and article 2, sections 8, 9, and 10 of the Arkansas Constitution. Without identifying which jurors he is referring to; Gay argues that two jurors stated that they would automatically impose a death sentence if Gay was convicted of capital murder. Gay appears to be referring to Sandra Barker and Carolyn Wetthington. Gay goes on to explain that the defense challenges for cause were denied because the jurors said that they would follow the law. Gay contends that the jurors were substantially impaired in their ability to give meaningful consideration to mitigating evidence. Additionally, Gay argues that he was denied the right to a fair and impartial jury because "none of the jurors were asked if they could consider any mitigation evidence particular to Gay's case." In denying relief on his fair-and-impartial-jury claims, the circuit court found that these arguments could have been reviewed on direct appeal and that Gay failed to prove prejudice or the likelihood that the outcome of the trial would have been different. We agree. In *Reams v. State*, we explained that

> [g]enerally, a petition under Rule 37 does not provide a remedy when an issue could have been raised at trial or argued on appeal. Rule 37 is a postconviction remedy and, as such, does not provide a method for the review of mere error in the conduct of the

7

trial or to serve as a substitute for appeal. However, we have made an exception for errors that are so fundamental as to render the judgment of conviction void and subject to collateral attack. When we review a "fundamental" or "structural" error either on direct appeal or through the exception described above, the fundamental nature of the error precludes application of the "harmless-error" analysis.

2018 Ark. 324, at 15–16, 560 S.W.3d 441, 452 (internal citations omitted). Gay asserts that his denial of a request to strike jurors for cause or to voir dire them on particular mitigating facts is an issue involving fundamental error; however, we are not persuaded by this argument.

## A. Strike for Cause

With regard to the circuit court's refusal to strike jurors Barker and Wetthington for cause, Gay fails to mention that Barker and Wetthington were not seated on the jury because he struck both with peremptory challenges. To the extent that Gay is arguing that Barker and Wetthington should have been struck for cause, we have explained that

> [w]e do not address this claim of error because it pertains to venirepersons that appellant excused through the use of his peremptory challenges. It is well settled that the loss of peremptory challenges cannot be reviewed on appeal. The focus should not be on a venireperson who was peremptorily challenged, but on the persons who actually sat on the jury.

*Willis v. State*, 334 Ark. 412, 420, 977 S.W.2d 890, 894 (1998) (internal citations omitted). In *Willis*, we held that because the particular venirepersons were not seated on the jury we did not need to consider whether they should have been struck for cause. Further, to the extent that Gay is arguing that he was forced to utilize all of the peremptory challenges, he also fails to acknowledge that he had three strikes left. Accordingly, we do not find merit in Gay's argument.

B. Mitigating Factors

Next, with regard to Gay's claim that he was denied the opportunity to question prospective jurors about mitigating factors specific to his case, Gay raised this exact issue in *Gay I*, and we rejected his argument:

> [Gay] makes conclusory statements and does not develop this argument. However, based on the record discussed above, the record does not support Gay's argument. Further, we do not consider an argument when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken. Further, based on our review of the record, Gay did not preserve this issue for review. Gay did not contemporaneously object to the voir dire or proffer questions he sought to ask the potential jurors.

*Gay I*, 2016 Ark. 433, at 8, 506 S.W.3d at 857 (internal citations and quotation marks omitted). Because this is a death case, Gay's direct appeal was subject to review under Rule 10 of the Arkansas Rules of Appellate Procedure–Criminal. We noted that the entire record was reviewed, including those issues that were not properly preserved for appeal, and we held that there was no reversible error. Further, the record was reviewed pursuant to Arkansas Supreme Court Rule 4-3(i) (2016) and no reversible error was found. We find no error on this point and affirm.

## II. *Ineffective Assistance of Counsel*

On appeal, Gay argues that (1) counsel was ineffective during jury selection; (2) counsel was ineffective for introducing the Arkansas Department of Correction Institutional File, also known as a "Pen Pack"; (3) counsel failed to object to victim-impact evidence; (4) counsel failed to object to the State's closing argument; (5) counsel failed to pursue self-defense or imperfect self-defense theories; (6) counsel failed to properly present the Scotty

Garner murder; (7) counsel failed to investigate and present evidence of posttraumatic stress disorder, alcohol-abuse disorder and childhood sexual abuse as mitigators; and (8) counsel failed to investigate and challenge the aggravators.

Turning to our standard of review with regard to a circuit court's ruling on a petitioner's request for Rule 37 relief, this court will not reverse the circuit court's decision granting or denying postconviction relief unless it is clearly erroneous. *Kemp v. State*, 347 Ark. 52, 55, 60 S.W.3d 404, 406 (2001). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been made. *Id.*; *Prater v. State*, 2012 Ark. 164, at 8, 402 S.W.3d 68, 74. "The benchmark for judging a claim of ineffective assistance of counsel must be 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]." *Henington v. State*, 2012 Ark. 181, at 3–4, 403 S.W.3d 55, 58. Pursuant to *Strickland*, we assess the effectiveness of counsel under a two-prong standard. First, a petitioner raising a claim of ineffective assistance must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Williams v. State*, 369 Ark. 104, 251 S.W.3d 290 (2007). A petitioner making an ineffective-assistance-of-counsel claim must show that his counsel's performance fell below an objective standard of reasonableness. *Springs v. State*, 2012 Ark. 87, 387 S.W.3d 143. A court must indulge in a

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

Second, the petitioner must show that counsel's deficient performance so prejudiced petitioner's defense that he was deprived of a fair trial. *Id.* The petitioner must show there is a reasonable probability that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Id.* Additionally, conclusory statements that counsel was ineffective cannot be the basis for postconviction relief. *Anderson v. State*, 2011 Ark. 488, 385 S.W.3d 783.

## A. Jury Selection

In his first ineffective-assistance argument, Gay contends that his trial counsel was ineffective during jury selection. The circuit court found that the allegations of error relative to trial counsel's inadequate voir dire were all matters of strategy within the limits imposed by the circuit court, and Gay failed to demonstrate that the presence of any seated juror prevented him from receiving a fair trial.

Specifically, Gay asserts that no juror was asked whether he or she could give meaningful consideration and effect to any of the approximately seventy mitigating factors presented. Trial counsel asked only if the venire could consider mitigating evidence generally.

11

No juror was asked, for example, if he or she could give intoxication, a history of child abuse and sexual victimization, or a mental-health disorder meaningful consideration and effect as a mitigating circumstance. Gay further asserts that the venire was asked if it could consider mitigating evidence, but only as a general category of evidence, and all venirepersons indicated that they could. To support his position, Gay relies on *Morgan v. Illinois*, 504 U.S. 719 (1992). In *Morgan*, the Court held that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." 504 U.S. at 729. Thus, *Morgan* stands for the proposition that a venireperson who will automatically vote for the death penalty, regardless of mitigators or aggravators, should be struck for cause. It does not stand for the proposition that Gay should have been allowed to question jurors about their views on "particular" mitigators.

Further, Gay has not demonstrated that trial counsel's performance was deficient under *Strickland*. During the Rule 37 hearing, Fraiser testified the defense team scoured the jury questionnaires and divided them into three stacks: good, questionable, concerning. In

the "concerned" stack were jurors that indicated they were pro-death penalty. Fraiser testified that his strategy was to seat as many jurors "as possible who would be bordering on being excluded because they could not consider the death penalty." Fraiser testified that his goal for these prospective jurors was to get them to say they could consider the death penalty in order to prevent the prosecution from striking them for cause. At trial, Fraiser asked the jury mitigation specific questions, including, "Do you consider [the possibility of life without parole] a severe punishment for a crime?" and "Some people are of the belief, because of religion, the way that they were raised, what they have read, life experience, that if you take a life you should forfeit your life. Do you believe that?"

Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for finding ineffective assistance of counsel. *Hartman v. State*, 2017 Ark. 7, 508 S.W.3d 28. When a decision by trial counsel is a matter of trial tactics or strategy and that decision is supported by reasonable professional judgment, then such a decision is not a proper basis for relief under Rule 37. *Van Winkle v. State*, 2016 Ark. 98, 486 S.W.3d 778. We agree with the circuit court's determination that Fraiser's voir dire was a matter of trial strategy. Finally, because Gay cannot demonstrate deficient performance, we need not consider the prejudice prong in *Strickland*.

## B. Pen Pack

In his second ineffective-assistance argument, Gay contends that his trial counsel was ineffective for introducing his Arkansas Department of Correction (ADC) "pen pack" during his sentencing phase. The pen pack consisted of approximately 300 pages and spanned all

periods of time that he had been incarcerated in the ADC. Gay contends that while his defense counsel purportedly introduced the pen pack as mitigating evidence, it was extremely prejudicial to his defense.

Gay asserts that the pen pack contained highly damaging information, including a record of Gay's parole violations and revocations. Notes from Gay's parole officer included evidence that Gay (1) had threatened to blow up someone's house; (2) had been arrested for battery while on parole; (3) had been seen carrying around a shotgun; (4) had beaten up a woman with whom he was having an affair; and (5) had been arrested for felon in possession of a firearm. The pack also contained a letter from Gay's father, Glen, to the parole board. The prosecution later used it against Gay in its closing argument. Specifically, Gay asserts that the prosecution, referring to the letter, argued that Glen had tried to help Gay get paroled and that Gay repaid Glen by killing him. The results of Gay's "Minnesota Multi-phasic Personality Inventory" (MMPI) test were also contained in the pack. Gay argues that the prosecution read the MMPI findings to the jury, suggesting that Gay had the personality of a cold-blooded killer.

During the Rule 37 hearing, Fraiser testified that the decision to introduce the pen pack as evidence in mitigation was made "in the context of this case and what we had to work with." Fraiser explained that the majority of Gay's adult life was spent in custody or in isolation, which limited the evidence that the defense could explore in mitigation. Fraiser explained that the pen pack was introduced to demonstrate Gay's ability to conform his behavior to the requirements of being institutionalized. Further, by the time the decision to

introduce the pen pack was made, the jury had already been introduced to proof that Gay had been involved in two previous homicides. Fraiser opined that the jury had already found Gay guilty and had seen the graphic pictures of Snow's body. Thus, Fraiser testified, by the time the pen pack was introduced, the defense was trying to convince the jury to "not forfeit [Gay's] life. Lock him up, put him in a confined environment, remove him from society. He'll no longer be a danger to society as a whole, and at least he has shown ability to not flourish but survive accordingly in that environment." When asked, "[O]ther than the pen pack, what type of evidence could you have presented to adequately convey that portion of your mitigation defense?" Fraiser testified that he could not find any ADC officer, guard, or administrator who was willing to come forward to render an opinion. On this issue, the circuit court found the decision to introduce the pen pack was a matter of trial strategy and not reviewable in a Rule 37 petition.

Here, counsel made a deliberate decision to allow introduction of the pen pack, and he provided his specific reasoning for doing so. Further, Gay's own witness, Professor Sullivan, acknowledged that the pen pack was the only evidence admitted to demonstrate that Gay was a "good prisoner in the mitigating evidence." As the State points out, the jury unanimously found the following mitigating factors: (1) Gay respects the chain of command at the ADC; (2) Gay functions best when he is in a highly structured situation in which he has a supervisor; (3) Gay has been respectful to correctional officers and administrators during his incarceration; (4) Gay is a model inmate; (5) Gay has never been in any fights or involved in any assaults during his years of confinement; (6) Gay has demonstrated his desire

15

to be productive and work at an assigned position while incarcerated; and (7) Gay has been rule abiding and complies with staff directives and work assignments while in custody, and as such, he is considered to be a good prospect for peaceful and productive adjustment while in custody. Accordingly, the circuit court did not clearly err in finding that the decision to introduce the pen pack was a matter of trial strategy.

## C. Victim-Impact Evidence

In his third ineffective-assistance argument, Gay contends that his trial counsel was ineffective for failing to object to Mary Beth Lansdell's penalty-phase victim-impact testimony. Specifically, Gay takes issue with Ms. Lansdell's statement about the loss of her mother "[d]ue to the actions of one man, who had no remorse, which resulted in taking our mother's life so ruthlessly." To support his argument, Gay relies on *Payne v. Tennessee*, 501 U.S. 808 (1991), recognizing that *Payne* overruled *Booth v. Maryland*, 482 U.S. 496 (1987), which prohibited victim impact statements. However, Gay notes that the *Payne* court left intact the prohibition against statements about "the crime, the defendant, and the appropriate sentence" because such statements violated the Eighth Amendment and were inadmissible. *Id.* at 830 n.2. Gay then goes on to cite an Eighth Circuit case, *Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010), which recognizes that the *Booth* prohibition against statements about the crime, the defendant, and the appropriate sentences remained intact. Gay argues that Lansdell's statement violated this prohibition because she commented directly on Gay—calling him remorseless. She also commented on the crime—calling it ruthless. Gay contends that without these statements, a reasonable probability exists to

16

believe the sentencing outcome would have been different. We disagree. The *Payne* court stated that if evidence was introduced that was "so unduly prejudicial" that it rendered "the trial fundamentally unfair," then the Due Process Clause of the Fourteenth Amendment could provide relief. *Id.* at 825. Given the record before us, Landsell's statement did not rise to the level of rendering Gay's trial fundamentally unfair. Therefore, we agree with the circuit court's finding that Gay failed to demonstrate that a different verdict would have been reached had his counsel made a sustainable objection.

As a secondary basis for denying relief, the circuit court found that the lack of objection to victim-impact evidence is a matter of trial strategy. We agree. During the Rule 37 hearing, Fraiser testified that he believed "that is going to be pretty egregious to step on a family victim member during their victim impact statement." In his own experience, he has "seen it blow up in someone's face to their detriment." Specifically, Fraiser recalled being a trial attorney in the capital-murder trial of Terrick Nooner. During Nooner's trial, the defense attorney posed a question to a family victim after victim impact testimony. Fraiser testified that the defense "asked a question that they should not have asked, and it was to the point with [family victim member]'s response, the jurors were crying and the court reporter was visibly crying. Given this, you have to be careful." Based on Fraiser's testimony regarding his experience with questioning a victim's family member, it was a matter of trial strategy to not appear insensitive to Lansdell's loss. We cannot say that the circuit court's findings in this regard were clearly erroneous.

D. State's Closing Argument

17

In his fourth ineffective-assistance argument, Gay contends that his trial counsel was ineffective for failing to object to the State's improper closing argument. A reversal of a judgment due to remarks made by counsel during closing arguments is rare and requires that counsel make an appeal to the jurors' passions and emotions. *Houghton v. State*, 2015 Ark. 252, 464 S.W.3d 922. Experienced advocates might differ about when, or if, objections are called for since, as a matter of trial strategy, further objections from counsel may result in comments seeming more significant to the jury. *Id.* Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct. *Howard*, 367 Ark. 18, 238 S.W.3d 24. Here, the circuit court found that the lack of objection to the State's closing argument was a matter of trial strategy; Gay failed to show that a different verdict would have been reached had counsel made a sustainable objection; and the argument was not a mischaracterization of the evidence presented.

Specifically, Gay argues that the prosecutor's comments—(1) that Gay "picked [the victim] up like a dead deer and chunked her, after he drug her, and he chunked her into the back of his truck"; (2) that "she's left there for four days so animals could eat her"; and (3) that he "pushes her up on his knee like she's a dead animal"—were overly inflammatory and that there is a reasonable probability that the jury would not have sentenced him to death had counsel objected.

We agree with the circuit court's determination that trial counsel's decision not to object during the State's closing argument was a matter of trial strategy. At trial, two witnesses testified that after Gay shot Snow, he dragged her to the back of his truck by her hair and belt loops, rolled her up on his knee, and put her in the back of his truck. Additionally, medical examiner Dr. Charles Kokes testified that when Snow's body was recovered, bones and tissue were missing from her face, which could have been caused by animal activity. We cannot say that the circuit court's findings in this regard were clearly erroneous. Accordingly, we agree with the circuit court and affirm the circuit court on this point.

## E. Self-Defense Theory

In his fifth ineffective-assistance argument, Gay contends that his trial counsel was ineffective for failing to pursue a self-defense or an imperfect self-defense theory. As a basis for this theory, Gay contends that a knife was found in the passenger compartment of the pickup truck that Snow occupied, and a photograph of the knife in the truck was introduced. In addition, Gay's "Prisoner Medical Treatment Report" contained Gay's statements that "a woman tried to stab him." On this issue, the circuit court found that Gay did not show that defense counsel failed to adequately investigate possible defenses or that such an investigation would have revealed anything that might have been admissible at trial in light of the other evidence presented and Gay's refusal to testify or actively participate in the preparation of his defense.

Counsel has a duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Kemp v. State*, 348 Ark. 750, 758,

19

74 S.W.3d 224, 227 (2002). Counsel's decision not to investigate must be directly assessed for reasonableness, applying a heavy measure of deference to counsel's judgments. *Id*. Given what counsel had to work with, it was reasonable to opt for a strategy that he believed had the most chance of success. The fact that he did not investigate what he believed to be a losing defense theory was a tactical decision and not a basis for Rule 37 relief. *See Flores v. State*, 350 Ark. 198, 206, 85 S.W.3d 896, 901 (2002).

Here, other than Gay's own self-serving statement, there is no evidence that Gay acted recklessly or in self-defense when he shot Snow. At trial, there was no evidence presented that Snow had a weapon or acted aggressively toward Gay. The two witnesses testified that Gay exited the truck and ordered Snow out of the truck; Snow did not comply, and Gay went back to his truck and retrieved a shotgun and again ordered Snow out of the truck. As Snow was attempting to exit the truck, Gay shot Snow in the right side of her face. Further, during the Rule 37 hearing, Fraiser testified that there was no indication from any witness during the trial that a knife was presented in a threatening manner to Gay when he shot Snow.

As the justification of self-defense was not available to Gay, his counsel necessarily did not render ineffective assistance of counsel by failing to raise the defense. *Edwards v. State*, 2017 Ark. 207, at 6, 521 S.W.3d 107, 112. Accordingly, we cannot say that the circuit court erred in denying Gay's petition on this issue.

F. Scotty Garner Murder

In his sixth ineffective-assistance argument, Gay contends that his trial counsel was ineffective for failing to properly investigate and present evidence of the killing of Gay's cousin, Garner, as a mitigating factor. Specifically, Gay argues that the jury could have concluded that Gay may have killed Garner. On this issue, the circuit court found that the reference to the Garner homicide was a matter of trial strategy. Further, the circuit court found that Gay failed to show that a different verdict would have been reached had counsel not made reference to this.

During the penalty phase, the defense elicited testimony regarding the death of Garner. Gloria Lindsay, Gay's sister, testified that both Gay and Glen were present when Garner was killed. According to Lindsay, Glen admitted to the authorities that he was the one who shot Garner, and then he recanted. However, Lindsay testified that as far as she knew, no one was ever charged with Garner's death. During closing argument, Fraiser emphasized to the jury that Glen claimed that he had shot Garner. "It was investigated and for whatever reason the authorities at that time . . . felt that Glen Gay should not be charged with an offense. That murder - or that homicide was ruled to be justifiable, but it's something that Randy saw."

At the Rule 37 hearing, Fraiser testified that he introduced evidence about Garner's death to demonstrate that Gay had been exposed to violence in his life. Fraiser testified that when Gay would not help the defense develop mitigation or facts relevant to the actual merits of the charge itself, he "did not have a lot to work with, and [was] trying to use family members to convey exposure to violence for mitigation purposes."

21

Based on the foregoing, the circuit court did not err in determining that the reference to the Garner homicide was a matter of trial strategy. Further, in light of Lindsay's testimony and Fraiser's closing argument indicating that Glen had shot Garner, Gay's bare allegation that the jury "could" have concluded that he shot Garner is not persuasive. Accordingly, we affirm the circuit court's decision on this point.

G. Failure to Investigate Mitigators

In his seventh ineffective-assistance argument, Gay contends that his trial counsel was ineffective for failing to investigate and present as mitigating factors evidence of his PTSD, alcohol abuse, and childhood sexual abuse.

In response, the State argues that Gay ignores the fact that counsel presented evidence in virtually all of these categories during the penalty phase—multiple witnesses testified about Gay's chronic alcohol abuse; Lindsay offered testimony regarding Gay's abuse at the hands of his father, Glen; and Lindsay offered testimony that Gay had been sexually abused by older boys at the children's home.

The circuit court found (1) that Gay failed to show that defense counsel did not adequately investigate possible mitigating factors; (2) that such an investigation would have revealed anything that might have been admissible at trial in light of other evidence presented; and (3) that Gay refused to testify or actively participate in the preparation of his defense, including refusal to undergo a mental evaluation.

A trial counsel's failure to investigate and present substantial mitigating evidence during the sentencing phase of a capital murder trial can constitute ineffective assistance of

22

counsel. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *Sanford v. State*, 342 Ark. 22, 25 S.W.3d 414 (2000). Counsel is obligated to conduct an investigation for the purpose of ascertaining mitigating evidence, and the failure to do so is error. *Coulter v. State*, 343 Ark. 22, 31 S.W.3d 826 (2000). Such error, however, does not automatically require reversal unless it is shown that, but for counsel's errors, there is a reasonable probability that the sentence would have been different. *Howard*, 367 Ark. 18, 238 S.W.3d 24. When reviewing a claim of ineffectiveness based upon failure to present adequate mitigating evidence, we view the totality of the evidence—both that adduced at trial and that adduced in the postconviction proceeding. *Id.*

Gay asserts that prior to trial, his trial counsel received his "Prisoner Medical Treatment Report," which Gay contends provided the following mitigation evidence: Gay's prior psychiatric treatment; that two days after the Snow homicide, he was diagnosed with "alcohol abuse, continuous drinking behavior"; evidence of prior diagnoses with alcohol-dependence disorder; a "Mental Health Social History" noting that Gay's father was an alcoholic and was abusive; on the day of the homicide, Gay drank a pint of whiskey and between twelve and twenty beers; he drank twelve beers a day for twenty-five years; Gay was a witness to his father's violence; Gay was victimized during a prior incarceration; Gay was symptomatic of PTSD; and Gay's father was abusive and had sexually abused Gay. Gay notes that trial counsel's file also contained numerous witness statements from an FBI investigation that contained mitigating evidence—that Gay was a heavy drinker; that he was in an orphanage when he was very young; that Gay had witnessed the murder of Garner;

23

and that several individuals stated that Glen had been sexually inappropriate with Sherry (Gay's first wife) and Candy (Gay's half-sister). Gay asserts that trial counsel's failure to adequately investigate and present this evidence was unreasonable and fell below the standard of care for defense counsel in capital cases. He also claims that a reasonable investigation would have resulted in competent counsel consulting with, and offering the testimony of, experts in the fields of child sexual abuse, PTSD, and chronic alcoholism. Further, Gay asserts that had this evidence been investigated and presented, one or more jurors would have rejected the death penalty.

During the Rule 37 hearing, Dr. Mendel, testified that he had conducted a psychological examination of Gay. His report focused on Gay's childhood-abuse experiences, including sexual abuse. Dr. Mendel opined that Gay had been subjected to a range of adverse childhood experiences that damaged him—childhood sexual abuse, verbal and emotional abuse, the loss of his mother who stopped being involved early in his life, and further abandonment when he spent time in an orphanage. Additionally, Gay witnessed his father threaten violence toward others and was subjected to his father's threats of violence toward him. Dr. Mendel opined that Gay's adverse childhood experiences would have provided an enormous amount of mitigating evidence. He also testified that he diagnosed Gay with PTSD, alcohol dependency, and major depressive disorder.

Dr. Roache testified that Gay suffered physical, sexual, and emotional abuse as a child; Gay and his father were alcoholics; and Gay's chronic alcohol abuse likely caused changes to his brain that made logical reasoning and impulse control more difficult for him.

24

Dr. Roache found that Gay was predisposed to alcohol-use disorder (AUD), which was likely genetically inherited from Glen. AUD causes structural changes in the brain that can result in neurocognitive deficits. As a result, Gay's actions are more impulsive or instinctual rather than deliberative or decisional. Dr. Roache agreed with Dr. Mendel's diagnosis of PTSD, which causes irritable behavior and angry outbursts, reckless or self-destructive behavior, hypervigilance, and an exaggerated startle response.

Despite Gay's assertion to the contrary, this is not a case in which trial counsel failed to investigate the mitigating evidence. As the State asserts, Gay's alcohol abuse was a consistent theme in his trial. Janice Cochran, Gay's second wife, testified that Gay and Glen both drank in excess and that Gay was always angry when he drank whiskey. John Ward, Gay's former employer, testified that Gay's drinking was the reason he stopped giving Gay jobs to do around his store. Lindsay testified that Gay drank heavily and was an alcoholic. She stated that she tried unsuccessfully to get Gay to seek help for his drinking problem. With regard to sexual abuse, Lindsay testified that Gay had been sexually abused by older boys at the children's home.

As to sexual abuse by Gay's father, the mitigation investigator's notes reflect that Gay reported that he had been sexually abused by his father. However, at the Rule 37 hearing, Fraiser testified that he decided not to introduce that evidence because he believed Gay would have objected to any attempt to put on testimony about the sexual abuse. Fraiser stated that he did not recall telling Gay that he expected Lindsay to testify about the sexual

25

abuse at the children's home for fear that he would have insisted that he not introduce such evidence.

Here, trial counsel discovered and presented mitigating evidence. Approximately seventy mitigating circumstances were submitted to the jury. Also, Fraiser testified that Gay refused to testify and develop mitigation facts. Further, as the State points out, the mitigation strategy proposed in the Rule 37 proceedings was the exact opposite of the one employed by trial counsel. At the Rule 37 hearing, Fraiser testified that the defense strategy during the sentencing phase was to demonstrate that Gay "could conform his behavior to the requirements of being institutionalized or in the Department of Correction[]." The postconviction strategy would have presented Gay "as a loose cannon who will react with violence when placed in a stressful environment." Here, trial counsel's decisions concerning mitigation evidence included matters of trial strategy and tactics.

Here, the jury heard an abundance of evidence about Gay's childhood, such as abuse by his father, sexual abuse by other children in the children's home, and his chronic alcohol abuse; however, it found that most of this evidence did not rise to the level of a mitigating circumstance. Despite this, the jury found that "the aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found by any juror to exist." Thus, Gay has failed to demonstrate that there is a reasonable probability that, but for counsel's failure to present testimony from the doctors, the jury would have reached a different result, namely a sentence of life imprisonment without parole. Therefore, we affirm the denial of relief on this point.

## H. Failure to Adequately Investigate and Challenge the Aggravating Factors of the Second-Degree Murders of Glen Gay and Jim Kelly

Gay's final ineffective-assistance argument is that trial counsel was ineffective for failing to further investigate or challenge the two second-degree murders that were used as aggravating factors. He contends that counsel should have presented additional circumstances surrounding the murders of his father-in-law, Kelly, and his father, Glen, to lessen the weight the jury gave to these aggravators. Gay asserts that the police file on Kelly's murder contained evidence that Gay had been drinking before the murder and that the week before Kelly's death, Gay had been talking about killing himself. Gay further contends that the file contained evidence that Kelly had told Gay that he would "beat his brains out" if he laid another hand on his daughter, Sherry. Gay further asserts that the file contained evidence of a letter from Sherry stating that a ten-year sentence with five years suspended, with parole eligibility after serving one-sixth of the five years was a fair and just sentence. In addition, Gay argues that there was evidence in the file on his father's murder that Glen had pulled a gun on Gay, that Glen had attacked Gay's wife, and that Gay shot Glen in self-defense. Gay asserts that none of this evidence was presented to the jury to lessen the weight of the aggravators related to Kelly and Glen.

In its supplemental order, the circuit court found that trial counsel fully and completely investigated the two murder convictions by securing all files associated with the murders in the possession of the prosecuting attorneys' offices and the circuit court clerk's office. The court also found that the decision whether to challenge these aggravating factors

27

was a matter of trial strategy. The court noted that counsel's strategy was to have Gay testify during sentencing about the aggravating and mitigating circumstances and try to explain them to the jury. However, Gay refused to testify even though counsel implored him to do so.

Here, Gay fails to recognize that trial counsel successfully obtained a motion in limine to prevent evidence about the circumstances leading up to Kelly's murder—that Gay had beaten his wife the night before and on previous occasions. Further, any attempt to introduce testimony to mitigate the effect of that prior murder would have opened the door to this harmful evidence. The file on Glen's murder contained multiple, varying descriptions of the circumstances behind that shooting, and Gay had admitted during a polygraph examination that Glen did not have a gun at the time of the murder. Gay's wife at the time, Janice Cochran, was the only other witness to Glen's murder. Cochran also testified during the sentencing phase, and her version of the events would have contradicted any evidence presented by Gay that he shot his father in self-defense. Cochran testified that she overheard an argument between Gay and Glen, heard a loud noise, and went outside the camper to see what had happened. Cochran testified that Gay came to the camper and retrieved shotgun shells, and when Cochran asked what was happening, Gay shoved her back into the camper and padlocked the door. Cochran testified that she could see Gay outside the camper loading the shotgun, that she heard a loud noise, and that Gay came back and let her out of the camper. Cochran testified that when she returned to where they were camping, she found Glen, who had been shot in the head. She testified that Gay made her help load Glen's body

into a boat and row it down the river. Cochran testified that she convinced Gay that they should turn themselves in to the police because she was afraid of Gay. Accordingly, because the prosecutor's file and the testimony of the only other witness do not support a self-defense inference, counsel did not perform deficiently by not investigating further. Finally, even if counsel had been able to introduce additional evidence about these prior murders, Gay has not demonstrated how this would have changed the jury's determination that these were aggravating circumstances, particularly when he pled guilty to one murder and was found guilty of the other. Thus, postconviction relief was not warranted on this claim.

## III. *Form 3*

For his third point on appeal, Gay argues that the third death-penalty verdict form ("Form 3") prohibits the jury from exercising mercy in violation of the Fifth, Eighth, and Fourteenth Amendments and article 2, sections 8, 9, and 10 of the Arkansas Constitution. Form 3 provided that if the jury determined that (A) the State proved beyond a reasonable doubt one or more aggravating circumstances; (B) the aggravating circumstances outweighed beyond a reasonable doubt any mitigating circumstances; and (C) the aggravating circumstances justify beyond a reasonable doubt a sentence of death, "then sentence Randy William Gay to Death on Form 4." Gay contends that Form 3 prohibited the jury from exercising mercy. On this issue, the circuit court found that this allegation of error could have been reviewed on direct appeal and does not constitute grounds for relief under Rule 37. We agree. As set forth in *Reams, supra*, unless an error is so fundamental as to render the judgment of conviction void and subject to collateral attack, a petition under Rule 37 does

not provide a remedy when an issue could have been raised at trial or argued on appeal. Here, Gay does not argue that this alleged error is structural or fundamental in nature. Accordingly, we agree with the circuit court's finding that this issue does not constitute grounds for relief under Rule 37.

Finally, we note Gay's acknowledgment that *Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943 (1996) rejects his very argument.[1] In *Kemp*, the appellant contended that the circuit court erred in refusing to give the jury his proffered penalty-phase instruction, which read as follows: "Whatever the jury finds regarding aggravating and mitigating circumstances, the jury may still return a verdict of life imprisonment without parole." In rejecting Kemp's argument, we explained that we have held "that AMCI 2d Form Three, Section (C) permits the jury to show mercy, as it allows the jury to find that the aggravating circumstances do not justify a sentence of death." *Id.* at 206, 919 S.W.3d at 957. Non-model instructions are to be given only when the circuit court finds that the model instructions do not accurately state the law or do not contain a necessary instruction on the subject. *Hill v. State*, 318 Ark. 408, 887 S.W.2d 275 (1994). Accordingly, we affirm on this issue.

## IV. *Sentencing Procedures*

For his fourth point on appeal, Gay argues that the sentencing procedures did not meet the statutory and constitutional requirements necessary for imposing the death penalty. Specifically, Gay contends that because the jury foreman failed to sign Form 2 and because

---

[1] While Gay recognizes that *Kemp v. State* does not support his argument, he states that the issue is raised to preserve it for federal habeas review.

there is an ambiguous mark on Form 3, his death sentence should be reversed. On this issue, the circuit court found that Gay could have raised alleged errors or inconsistencies in the verdict form at trial or on direct appeal, and therefore, these arguments are not cognizable in his postconviction proceeding. We agree. As set forth in *Reams*, *supra*, unless an error is so fundamental as to render the judgment of conviction void and subject to collateral attack, a petition under Rule 37 does not provide a remedy when an issue could have been raised at trial or argued on appeal. Here, Gay does not argue that this alleged error is structural or fundamental in nature. Accordingly, we agree with the circuit court's finding that this issue does not constitute grounds for relief under Rule 37. Accordingly, we affirm on this point.

## V. *Verdict Forms*

For his fifth point on appeal, Gay argues that the verdict forms failed to establish that the jury considered all mitigating evidence. The State alleged three aggravating factors pursuant to Ark. Code Ann. § 5-4-604(3), which provides: "The person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person[.]" Gay contends that the statute and the jury instruction are vague and failed to genuinely narrow the class of death-eligible individuals. Further, Gay contends that the statute and instruction are also vague because while a person may "commit" an offense, the conduct may be justified, for example, in a case of self-defense of another. The circuit court found that this allegation of error could have been reviewed on direct appeal and does not constitute grounds for relief under Rule 37. As set forth in *Reams*, *supra*, unless an error is

so fundamental as to render the judgment of conviction void and subject to collateral attack, a petition under Rule 37 does not provide a remedy when an issue could have been raised at trial or argued on appeal. Here, citing *Sullivan v. Louisiana*, 508 U.S. 274 (1993), and *Teater v. State*, 89 Ark. App. 215, 201 S.W.3d 442 (2005), without analysis or explanation, Gay asserts that a deficient jury instruction amounts to a structural error. The structural errors involved in *Sullivan* and *Teater* are clearly distinguishable from the alleged error in the present case. In *Sullivan*, the Court found that a constitutionally deficient jury instruction concerning the burden of proof was a "structural" error that was not amenable to harmless-error analysis and thus required automatic reversal of the defendant's conviction. The Court stated as follows:

> In [*Arizona v. Fulminante*, 499 U.S. 279, 307-309], we distinguished between, on the one hand, "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards," . . . and, on the other hand, trial errors which occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented[.]" . . . Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former sort, the jury guarantee being a "basic protectio[n]" whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function. . . . The right to trial by jury reflects, we have said, "a profound judgment about the way in which law should be enforced and justice administered." . . . The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error."

*Sullivan*, 508 U.S. at 281–82. In *Teater*, the court of appeals held that the error in omitting the instruction on mental disease or defect is a "structural" error that is not subject to harmless-error review. Citing *Sullivan*, the court of appeals explained that the Sixth Amendment to the United States Constitution affords a criminal defendant the right to

have an impartial jury reach the requisite finding of guilt. *Teater v. State*, 89 Ark. App. at 222, 201 S.W.3d at 447. Gay's bare assertion that the instruction and statute are vague does not rise to the level of a structural error. We agree with the circuit court's finding that this issue does not constitute grounds for relief under Rule 37. Accordingly, we affirm the circuit court on this point.

## VI. *Lack of Remorse*

For his final point on appeal, Gay argues that the State improperly argued lack of remorse as a nonstatutory aggravating factor. Gay asserts that Ark. Code Ann. § 5-4-604 limits the State to proving one or more of ten specific factors but that lack of remorse is precluded. Gay contends that the State used a letter written by Gay's father, Glen, to the Arkansas Parole Board asking for Gay's release. Gay asserts that the State argued that the letter implied that Gay was remorseless. The circuit court found that this allegation of error could have been reviewed on direct appeal and does not constitute grounds for relief under Rule 37.

As set forth in *Reams*, *supra*, unless an error is so fundamental as to render the judgment of conviction void and subject to collateral attack, a petition under Rule 37 does not provide a remedy when an issue could have been raised at trial or argued on appeal. Here, Gay does not argue that this alleged error is structural or fundamental in nature. Therefore, we agree with the circuit court's finding that this issue does not constitute grounds for relief under Rule 37. Therefore, we affirm the circuit court on this point.

Affirmed.

Special Justice TIM SNIVELY joins in this opinion.

WOOD, J., not participating.

*FUQUA CAMPBELL, P.A.*, by: *J. Blake Hendrix*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rachel Kemp*, Sr. Ass't Att'y Gen.; and *Adam Jackson*, Ass't Att'y Gen., for appellee.